GRANT S. YOUMANS v. EDWARD F. BERKNER AND OTHERS.[1]

April 9, 1926.

No. 25,228.

**What constitutes defense to action for malicious prosecution.**

One who institutes a criminal prosecution pursuant to the advice of an attorney who knew all the facts known to the complainant, has a complete defense to an action for malicious prosecution.

Malicious Prosecution, 38 C. J. p. 428 n. 40; p. 429 n. 42 New.

See note in 18 L. R. A. (N. S.) 50; 12 A. L. R. 1230; 18 R. C L. p. 45; 3 R. C. L. Supp. p. 782; 4 R. C. L. Supp. p. 1176; 5 R. C. L. Supp. p. 971.

Action in the district court for Hennepin county for malicious prosecution. The case was tried before Dickinson, J., and a jury which returned a verdict in favor of defendant Bosshard and against defendant Berkner. The court rendered judgment in favor of defendant Berkner notwithstanding the verdict. Plaintiff appealed from the judgment. Affirmed.

*Keyes, Pardee & Solether* and *Arthur Le Sueur*, for appellant.
*Einar Hoidale* and *Somsen, Dempsey & Flor*, for respondent.

TAYLOR, C.

Action for malicious prosecution. The summons was not served on defendant Peabody who had removed to California. The jury returned a verdict in favor of defendant Bosshard and against defendant Berkner. The court rendered judgment for defendant Berkner notwithstanding the verdict and plaintiff appealed therefrom.

Plaintiff had been indicted by the grand jury of Hennepin county on the charge that he had obtained property from defendant Bosshard. by false and fraudulent representations and pretenses. He was tried and acquitted. Thereafter he brought this action alleging

[1]Reported in 208 N. W. 530.

that the defendants had caused the criminal prosecution to be brought against him maliciously and without probable cause.

The transaction which led to the prosecution was briefly as follows: Berkner held a mortgage for $20,000 on a hotel owned by Bosshard in the city of New Ulm. Bosshard owned a house and lot in the city of Minneapolis encumbered by a mortgage. Plaintiff was the president of a corporation doing business in the city of Minneapolis and owned all the capital stock of the corporation except two qualifying shares held by the other officers. This corporation owned some vacant lots in Morningside, a suburb of Minneapolis, and had entered into a contract with one John M. Davis whereby it agreed to sell and Davies agreed to buy these lots for the sum of $14,500. The contract recited that Davis had paid the sum of $5,500 thereon, had assumed a mortgage of $4,000 on the lots, and provided that he was to pay the remaining $5,000 of the purchase price in quarterly instalments of $300 each. Plaintiff, Bosshard and Berkner made an agreement by which Bosshard conveyed his Minneapolis property to the corporation, the corporation transferred these lots and the Davis contract to Berkner and Berkner gave Bosshard credit for the amount due on the Davis contract upon the mortgage which he held against Bosshard's New Ulm property.

Negotiations for the deal were initiated by William M. Watson, acting for plaintiff, who made a proposition to Bosshard to take his house and lot and give him the Davis contract and a second mortgage on the house and lot. Bosshard refused to make the exchange unless he could arrange with Berkner to take the Davis contract and apply it as a payment on the mortgage held by Berkner. Bosshard went to Sleepy Eye where Berkner resided and explained the proposition to him. Berkner said that, if Davis had paid $5,500 on the contract and was keeping up the payments, he thought he could take it and give Bosshard credit for it. Berkner accompanied Bosshard to Minneapolis where they saw Watson and plaintiff. Berkner employed defendant Peabody, a Minneapolis attorney, as his attorney, and Berkner, Peabody and Bosshard met plaintiff and Watson at plaintiff's office. The various matters involved were dis-

cussed, and the three parties came to an agreement and consummated the deal.

The defendants claim that plaintiff represented that Davis was a substantial Minneapolis contractor who was about to improve the property; that he had paid $5,500 in cash at the making of the contract and had paid the two quarterly instalments which had become due; that these statements were false; that no such man as Davis could be found; and that the contract was a sham.

Plaintiff admits that Davis had not made any cash payment; that he had not paid either of the instalments which had become due; and that he had not paid the interest on the mortgage which he had assumed nor the taxes on the land. Plaintiff denies stating that Davis was a Minneapolis contractor and claims that he told defendants that Davis was a stranger to him who said that he resided in Indianapolis. Plaintiff also denies stating that Davis had paid $5,500 in cash and claims that he had merely stated that that amount had been paid down without saying how it had been paid. He claims that it was paid by the conveyance to him of some Michigan land, but admits that he never saw the land and knew nothing concerning it. He also denies stating that Davis had paid the two past-due instalments, and claims that he told defendants that they were not paid but that in September he had agreed to carry them for Davis until he returned in the spring. He admits that he has never heard from Davis since and has been unable to locate him. Plaintiff testified on direct examination that he drew the contract covering the agreement for the transfer of the properties in the presence of Watson and Bosshard while Berkner and his attorney Peabody were in the front room, and that when it was drawn up Berkner and Peabody were called in and "they went into all the details and the particulars of the property, and the man Davis, and the contract for deed, the taxes on the property, the interest on the mortgage and the payments that had not been endorsed on the contract, but in fact had not been paid on the contract—went into all those little details."

On cross-examination he testified that after Peabody and Berkner came in Peabody "read the contract over to Mr. Berkner, line by

line, very carefully, and discussed it, and then asked me questions: 'How about this interest?' 'How about these payments?' 'What about Davis?' 'Who is Davis?' 'Where is he now?' 'Why hasn't he paid the interest on the mortgage, and taxes on the land, and the payments?' That was all gone over very carefully."

It may be proper to note here that the two past-due instalments on the Davis contract are indorsed thereon as paid, but plaintiff claims that he charged these amounts to Davis on a book account and that the indorsements were made after the deal was completed and with the knowledge and consent of the defendants, which the defendants deny.

After being unable to find Davis, Berkner had several interviews with plaintiff and also with Peabody. In May, 1923, Peabody said that he had investigated the matter further and was satisfied that plaintiff had perpetrated a swindle. At Peabody's suggestion they went to the county attorney where Peabody started to explain the transaction. The county attorney, seeing that the matter was somewhat complicated, suggested that Peabody go back to his office and put the statement in writing. Peabody acquiesced, and thereafter prepared a written statement and submitted it to the county attorney. It is designated in the record as defendant's Exhibit 2. The county attorney held it under consideration for three or four weeks and caused some investigation to be made on his own account. He then submitted the matter to the grand jury who returned an indictment against plaintiff. At the trial he was acquitted as before stated. Berkner was one of the witnesses before the grand jury and at the trial.

The information on which the county attorney acted, other than what he may have obtained from his own investigation, was contained in the written statement given him by Peabody. Berkner had no part in preparing that statement, knew nothing of its contents and never saw it until the present action was begun. It gives an account of this transaction and also of another transaction by plaintiff. It is too long to quote. The misrepresentations alleged to have been made are stated as of Peabody's own knowledge and

not as having been communicated to him by Berkner. That Peabody had as full knowledge of the representations actually made as Berkner had is apparent from plaintiff's own testimony.

The learned trial court directed judgment for Berkner on the ground that "he was acting on the advice of and under the direction of competent counsel;" and on the further ground that, "between Berkner and blame in this case stands not only the direction of his own counsel but the action of the state's attorney and the grand jury."

Where a person states fully and fairly to an attorney all the facts known to him and is advised that such facts warrant a criminal prosecution, and acting in good faith he institutes a prosecution in reliance upon such advice, he has a complete defense to an action for malicious prosecution. Jones v. Flaherty, 139 Minn. 97, 165 N. W. 963; Moore v. N. P. Ry. Co. 37 Minn. 147, 33 N. W. 334; Dombrovske v. Dombrovske, 137 Minn. 56, 162 N. W. 891; Eversoll v. Mosher, 152 Minn. 448, 454, 189 N. W. 127; Kasal v. Picha, 156 Minn. 446, 195 N. W. 280; Cox v. Lauritsen, 126 Minn. 128, 147 N. W. 1093.

Here the attorney knew all the facts known to Berkner and the attorney, not Berkner, gave the prosecuting officer the information upon which the prosecution was instituted. It is doubtful if the evidence would sustain a finding that Berkner instigated the prosecution, for he did not furnish the information upon which the county attorney acted and had no knowledge of the contents of the written statement upon which the action of that officer was based. Cox v. Lauritsen, 126 Minn. 128, 147 N. W. 1093. But, however this may be, he is fully protected by the advice given him by his counsel.

Judgment affirmed.